**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Dennis Alexander Minarcaja Concha,<br><br>                            Petitioner,<br><br>                  -v-<br><br>Todd Lyons, in his official capacity, Field Office Director for U.S. Immigration and Customs Enforcement (ICE) in New York; Kristi Noem, in her official capacity, Secretary of the Department of Homeland Security; Pamela Bondi, in her official capacity, Attorney General,<br><br>                       Respondents. | 2:25-cv-6695<br>(NJC) |

**OPINION AND ORDER**

NUSRAT J. CHOUDHURY, United States District Judge:

Dennis Alexander Minarcaja Concha was detained by Immigration and Customs

Enforcement ("ICE") officers when he appeared for an ICE supervision appointment on

December 3, 2025. He brings this petition for a writ of habeas corpus (the "Petition") pursuant to

28 U.S.C. § 2241 to challenge the legality of his detention. (Pet. For Writ of Habeas Corpus

("Pet."), ECF No. 1.)[1] According to the Petition, ICE's detention of Mr. Minarcaja Concha

without notice and an opportunity to be heard violates Section 236(a) of the Immigration and

---

[1] Counsel for Mr. Minarcaja Concha filed the Petition several times on the docket in an administrative error. (*See* ECF Nos. 1, 2, 3.) The three Petitions are identical but contain different attachments. The first filing attaches the Order to Show Cause. (ECF No. 1-1.) The second filing attaches: (1) a Notice to Appear, a Form I-200, Warrant for Arrest of Alien, and a Notice of Custody Determination, all dated July 18, 2022 (ECF No. 2-1); (2) the July 19, 2022 Order of Release on Recognizance (ECF No. 2-2); and (3) a Biometrics Appointment Notice for a January 3, 2024 appointment (ECF No. 2-3). The third filing attaches the Civil Cover Sheet. (*See* ECF No. 3-1.) The Court considers the first filing of the Petition (ECF No. 1) as the operative document and the submissions located at ECF Nos. 1-2, 2-1, 2-2, 2-3, and 3-1 as the operative exhibits.

Nationality Act ("INA"), 8 U.S.C. § 1226(a) ("Section 1226(a)"), and the Due Process Clause of the Fifth Amendment to the U.S. Constitution. (Pet. ¶¶ 25, 28–49.)

Respondents are federal government officials: Todd Lyons, Acting Director of the ICE New York Field Office; Kristi Noem, the Secretary of the Department of Homeland Security ("DHS"); and Attorney General Pamela Bondi. Respondents argue that Mr. Minarcaja Concha's detention falls under a different INA provision, 8 U.S.C. § 1225(b)(2) ("Section 1225(b)(2)"), which governs the mandatory detention of certain noncitizens who are "seeking admission" to the United States. (Mem. L. Resp. Show Cause Order ("Resp.") at 7, ECF No. 15.)[2] According to Respondents, Section 1225(b)(2) requires Mr. Minarcaja Concha's detention, and he has no right to any additional process under the Due Process Clause.

Respondents are incorrect, as the vast majority of courts throughout this District, Circuit, and even the country have held in similar cases. Moreover, the conditions in which they held Mr. Minarcaja Concha for the first twenty-four hours of his detention shock the conscience, falling below any minimum standards for ICE detention facilities.

Shortly after Mr. Minarcaja Concha arrived in the United States in 2022, an ICE officer released him on his own recognizance, thereby determining that he did not pose any public safety or flight risk. With that authorization, Mr. Minarcaja Concha moved to New York and resided continuously there for more than three and a half years until his sudden arrest and detention by ICE. During that time, he duly reported for his ICE check-ins, applied for asylum, and was granted work authorization for five years by United States Citizenship and Immigration Services

---

[2] Respondents filed their Response twice on the docket. (*See* ECFs No. 14, 15.) In their second filing, Respondents confirm that the briefs are identical "with the exception of the inclusion of a Table of Authorities." (ECF No. 15.) The Court herein refers to ECF No. 15 as the operative Response.

("USCIS"). Without any notice, opportunity to be heard, or individualized consideration, ICE arrested and detained Mr. Minarcaja Concha when he appeared—as he had on previous occasions—at an ICE supervision appointment in Nassau County.

ICE's detention of Mr. Minarcaja Concha deprived him of his significant liberty interest in remaining free from detention—the paramount interest triggering the procedural due process protections of the Fifth Amendment. While ICE detained him in several different locations, they kept him in shocking conditions for twenty-four hours in what is known as the "Central Islip Hold Room"—an ICE facility located in the Alfonse D'Amato U.S. Courthouse in Central Islip, New York. There, Mr. Minarcaja Concha was one of seven or eight people locked in a small, unheated or poorly heated cell containing an open toilet that is designed for the brief detention of a single individual. He was detained without access to a bunk, bedding, soap, a shower, a toothbrush, or clean clothes. These deplorable conditions are documented by witness testimony not just in this case, but in two others, as described aptly by Judge Gary Brown of this District in *Clarke v. U.S. Department of Homeland Security, et al.*, 2025 WL 3674471 (E.D.N.Y. Dec. 18, 2025).

These appalling conditions underscore precisely why, in our nation governed by the rule of law, due process requires notice and an opportunity to be heard to guard against the erroneous deprivation of liberty. Freedom is precious. And when at liberty, a person is not subject to being locked up in a crowded, cold room that may reek of urine from the open toilet, where the lights are kept on for twenty-four hours a day.

For the reasons explained below, Respondents' detention of Mr. Minarcaja Concha is unlawful. The detention is governed by Section 1226(a)—not Section 1225(b)(2) or any other INA provision requiring mandatory detention—based on the plain text of these statutory

provisions. Neither at the time of his arrest, nor at any point thereafter, was Mr. Minarcaja Concha subject to mandatory detention under Section 1225(b)(2) as a noncitizen who, among other things, was "seeking admission" to the United States. Moreover, ICE's release of Mr. Minarcaja Concha on his own recognizance in 2022 was premised by law on an ICE officer's determination that he did not pose a safety or flight risk. Nothing in the record before this Court shows any change in circumstances in the three and a half years that followed. Rather, Mr. Minarcaja Concha resided continuously in the United States, worked in construction with authorization from the federal government, and reported to his ICE supervision appointments as directed.

Respondents provided Mr. Minarcaja Concha no notice or opportunity to be heard prior to his sudden arrest and detention, much less the minimum requirements of an individualized determination by a DHS officer that he posed a flight or safety risk. In light of Mr. Minarcaja Concha's significant interest in physical liberty—even as a noncitizen subject to discretionary detention under Section 1226(a)—the high risk of erroneous deprivation resulting from detention without notice or opportunity to be heard, and the government's failure to show that Mr. Minarcaja Concha's detention is needed to protect public safety or guard against any flight risk, Respondents' detention of Mr. Minarcaja Concha without any notice or opportunity to be heard is a violation of his Fifth Amendment right to procedural due process. The Petition is therefore granted.[3]

---

[3] The Court granted the Petition orally on December 12, 2025, providing its reasons on the record and noting that a more detailed written opinion would follow. (Hr'g Tr. 34:8–48:10.) This Opinion and Order provides the Court's full analysis.

Finally, although not the focus of this Opinion and Order, the Court also observes that a significant portion of the remedy imposed by the Court for Respondents' constitutional violation—ICE's immediate release of Mr. Minarcaja Concha—was frustrated due to Respondents' violation of two clear and unambiguous orders of this Court: one requiring Respondents to produce him before this Court on December 12, 2025 for a hearing on the Petition and another prohibiting Respondents from transporting Mr. Minarcaja Concha outside of the Eastern District of New York, Southern District of New York, or the District of New Jersey. Respondents violated these Orders by sending Mr. Minarcaja Concha to New Mexico and by failing to physically bring him to Court on December 12, 2025. This Court will address in a separate order whether to conduct additional proceedings concerning possible contempt findings and sanctions against Respondents.

## BACKGROUND

I.    **Factual Background**

A.    **Mr. Minarcaja Concha's Entry into the United States**

Dennis Alexander Minarcaja Concha is a 23-year-old Ecuadorian national who currently resides in Elmhurst, New York with his wife and daughter. (Pet. ¶¶ 1, 7, 24.) On July 13, 2022, Mr. Minarcaja Concha entered the United States by crossing the Rio Grande River near Eagle Pass, Texas, where he encountered an unnamed United States Customs and Border Protection ("CBP") agent. (Pet. ¶¶ 24; Decl. of Achillies Shinas ("First Shinas Decl.") ¶ 3, ECF No 14-1.)

Several days later, on July 18, 2022, a CBP agent served Mr. Minarcaja Concha with a Notice to Appear for a November 10, 2022 immigration proceeding at 26 Federal Plaza, New York, NY 10278. (ECF No. 2-1; *see also* Pet. ¶ 1; First Shinas Decl. ¶ 4.) That document asserts that Mr. Minarcaja Concha was subject to removal under INA Section 212(a)(6)(A)(i), which

corresponds to 8 U.S.C. § 1182(a)(6)(A)(i), and was placed "[i]n removal proceedings under section 240 of the Immigration and Nationality Act," which corresponds to 8 U.S.C. § 1229a. (ECF No. 2-1 at 1.)

Also on July 18, 2022, a CBP agent served Mr. Minarcaja Concha with a Form I-200, Warrant for Arrest of Alien and a Form I-286, Notice of Custody Determination. (*See* ECF No. 2-1 at 4–5; First Shinas Decl. ¶ 4.) The warrant is signed by Acting/Patrol Agent in Charge Samuel Moreno, and asserts that Mr. Minarcaja Concha was "liable to being taken into custody as authorized by section 236 of Immigration and Nationality Act," which corresponds to 8 U.S.C. § 1226. (ECF No. 2-1 at 4.) However, the Notice of Custody Determination, also signed by Moreno, provides that Mr. Minarcaja Concha "will be . . . released" "on [his] own recognizance." (*Id*. at 5.)

On July 19, 2022, ICE issued Mr. Minarcaja Concha a Form I-220A, Order of Release on Recognizance (the "ROR"), signed by an ICE Supervisory Detention and Deportation Officer. (*See* ECF No. 2-2; Pet. ¶ 2; First Shinas Decl. ¶ 4.) The ROR indicates that ICE released him "[i]n accordance with section 236 of the Immigration and Nationality Act," and sets forth release conditions, which among other things, require Mr. Minarcaja Concha to report for hearings and interviews as directed by ICE and the Executive Office for Immigration Review, surrender for removal if ordered to do so, refrain from committing any legal violations, and report to the ICE New York Field Office on August 23, 2022. (ECF No. 2-2 at 1.) It includes an "Addendum" setting forth additional conditions, including the requirements not to "associate with known gang members, criminal associates, or be associated with any such activity" and not to "commit any crimes." (ECF No. 19-2 at 8.) The ROR provides that Mr. Minarcaja Concha's release was "contingent upon" enrollment and successful participation in an Alternatives to Detention

6

("ATD") program, in which he would be "subject to electronic monitoring and may be subject to a curfew." (ECF No. 2-2 at 1; *see also* ECF No. 19-2 at 18 (containing ATD Enrollment Notice).) According to the ROR, failure to comply with those conditions "may result in revocation of . . . release and . . . arrest and detention by Immigration and Customs Enforcement." (ECF No. 2-2 at 1.)

### B. Compliance with Reporting Requirements, Application for Asylum, and Employment Authorization

Following his release, Mr. Minarcaja Concha wore a GPS monitoring device for approximately two months in accordance with the ATD program requirements. (Hr'g Tr. 30:7–16.) He also appeared for regular ICE supervision appointments. (Pet. ¶ 6; Hr'g Tr. 29:13–30:3.)

On November 10, 2022, Mr. Minarcaja Concha appeared in immigration court pursuant to the July 18, 2022 Notice to Appear and sought an adjournment to seek legal representation. (First Shinas Decl. ¶ 5.) The case was adjourned first to April 13, 2023, and again to September 7, 2023. (*Id.* ¶¶ 5–6.)

In late 2023, Mr. Minarcaja Concha submitted a Form I-589, Application for Asylum and for Withholding of Removal. (Pet. ¶ 4; *see also* ECF No. 2-3 at 1.) On January 3, 2024, he appeared for a biometrics appointment in relation to that application. (*Id.*) On January 14, 2025, the Immigration Court issued a Notice of Hearing scheduling a March 12, 2025 Individual Merits hearing relating to Mr. Minarcaja Concha's asylum application. (First Shinas Decl. ¶ 9.) On March 12, 2025, the Immigration Court sua sponte adjourned the Individual Merits hearing to November 13, 2026. (*Id.* ¶ 10.)

On August 30, 2024, USCIS issued Mr. Minarcaja Concha an Employment Authorization Document, which permits him to work lawfully in the United States through August 29, 2029. (Pet. ¶ 5.)

### C.  **New York Charges**

On September 30, 2025, the New York City Police Department (the "NYPD") arrested Mr. Minarcaja Concha for "Possession of a Forged Instrument in the 3rd Degree pursuant to New York Penal Law § 170.20" and for certain vehicle and traffic law infractions.[4] (First Shinas Decl. ¶ 11; *see also* ECF No. 19-2 at 23.) The parties do not dispute that all of those charges were dismissed. (*See* Decl. of Achillies Shinas ("Second Shinas Decl.") ¶ 6, ECF No. 19-1.)[5] Accordingly, ICE permitted Mr. Minarcaja Concha to continue under the Alternatives to Detention program, as he had been doing since July 2022. (*Id.*)

On November 17, 2025, the New York City Police Department again arrested Mr. Minarcaja Concha for "Possession of a Forged Instrument in the 3rd Degree pursuant to New York Penal Law § 170.20." (*Id.* ¶ 7; *see also* ECF No. 19-2 at 24.) There is no record that this arrest led to any conviction or other disposition.

### D.  **Arrest and Detention in the Central Islip Hold Room**

On December 3, 2025, Mr. Minarcaja Concha appeared for a regular ICE supervision appointment at 6851 Jericho Turnpike in Syosset, New York, where ICE officers arrested him. (Pet. ¶ 8; First Shinas Decl. ¶¶ 13–14.) He was in full compliance with his ICE supervision requirements. (Pet. ¶ 6; Hr'g Tr. 30:17–31:7.) Prior to the arrest, Respondents did not make any

---

[4] Law enforcement records provided by Respondents describe these infractions as "Motor Vehicle Violation: Operating Unregistered Vehicle," "Operating a Motor Vehicle Without Financial Security," and "Equipment Violation: Front Windshield Nontransparent." (ECF No. 19-2 at 23.)

[5] ICE Deportation Officer Shinas initially reported to this Court that the disposition of these charges was unknown. (First Shinas Decl. ¶ 11.) In response to this Court's order directing Respondents to provide documentation about the disposition of these charges, Shinas corrected the misrepresentation in his second declaration, where he attests that ICE learned that all of the charges relating to the September 30, 2025 arrest were dismissed. (Second Shinas Decl. ¶ 6.)

individualized determination that Mr. Minarcaja Concha violated any condition of his ROR. (Hr'g Tr. 28:23–29:12.) During the arrest, Respondents served Mr. Minarcaja Concha with a Form I-200 Warrant of Arrest, which invokes INA Section 236 (8 U.S.C. § 1226). (Hr'g Tr. 20:11–15; *see also* ECF No. 19-2 at 26.)

Following the arrest, ICE officers brought Mr. Minarcaja Concha to the Central Islip Hold Room, located at 535 Federal Plaza, New York, New York in the Alfonse D'Amato U.S. Courthouse, for processing. (Second Shinas Decl. ¶ 8.) There, they served him with another Form I-200 Warrant of Arrest. (Hr'g Tr. 21:15–21; *see also* Ex. 19-2 at 32.) At the Central Islip Hold Room, ICE officers completed a Form I-213, Record of Deportable Inadmissible Alien, which asserts that Mr. Minarcaja Concha "was processed as re-arrest as he violated the terms of his ROR/ATD release due to his recent arrests." (ECF No. 19-2 at 30.) It is undisputed that the Form I-213 was prepared only *after* ICE arrested Mr. Minarcaja Concha and brought him to the Central Islip Hold Room. (*See* Second Shinas Decl. ¶ 8 (indicating that ICE completed the Form I-213 "after" Mr. Minarcaja Concha was "booked in").)

Mr. Minarcaja Concha testified before the undersigned about his detention in the Central Hold Room with the assistance of a Spanish-language interpreter. (*See* Hr'g Tr. 7:3–19:14.)[6] The Court finds his testimony to be credible.

---

[6] As discussed later in this Opinion and Order, Mr. Minarcaja Concha appeared by telephone for the hearing because Respondents violated two clear and unambiguous Court orders—the Court's December 4, 2025 Order to Show Cause and December 8, 2025 Order to Produce—in transporting him to New Mexico just days before the hearing.

At the hearing, Respondents stated that they did not object to the Court asking Mr. Minarcaja Concha questions. (Hr'g Tr. 8:16–20.) Neither party requested that Mr. Minarcaja Concha be placed under oath. Without objection, the Court relied on Mr. Minarcaja Concha's unsworn statements about certain factual matters during the hearing.

During processing in the Central Hold Room, ICE permitted Mr. Minarcaja Concha to make one phone call, which he used to call his wife and request that she contact his attorney. (Hr'g Tr. 16:6–16.) ICE did not permit Mr. Minarcaja Concha to make another phone call to speak directly with his attorney. (*Id*. 16:17–17:1.) His family was not permitted to visit. (*Id*. 17:2–4.) An interpreter was not present, although one of the ICE officers who detained him spoke "a little" Spanish. (*Id*. 17:5–9.)

ICE detained Mr. Minarcaja Concha in the Central Islip Hold Room for around twenty-four hours, starting at around 10:10 a.m. on December 3, 2025 and ending at around 10:00 a.m. on December 4, 2025. (Second Shinas Decl. ¶¶ 8, 15.) During that time, ICE detained him in a room that contained "about seven or eight people" total, which Mr. Minarcaja Concha estimates was around four feet by four feet in size. (Hr'g Tr. 9:3–10.) The room contained a toilet and a sink, which were in view of the other detainees and were not sectioned off from the area where detained persons sat, slept, and ate. (*Id*. 9:15–10:17, 11:13–16.) ICE did not provide Mr. Minarcaja Concha with a blanket, pillow, mat to sleep on, a clean change of clothing, or any hygiene products, such as hand soap, toothpaste, or a toothbrush. (*Id*. 11:22–12:17, 15:1–9, 15:15–19.) The room did not have a shower and Mr. Minarcaja Concha was not provided access to a shower during his detention in the Central Islip Hold Room. (Second Shinas Decl. ¶ 14; Hr'g Tr. 9:8–10.) ICE officers provided meals and bottled water around usual mealtimes in the morning, afternoon, and evening. (Hr'g Tr. 13:19–14:23.) However, the lights remained on during Mr. Minarcaja Concha's twenty-four hours in the room and were not turned off at any point to allow detained persons to sleep. (*Id*. 11:1–3.) Mr. Minarcaja Concha estimates that there are around four different rooms for detainees in the Central Islip Holding Room. (*Id*. 13:15–18.)

10

Mr. Minarcaja Concha's testimony about the detention conditions in the Central Islip

Hold Room is corroborated by two other ICE detainees who were detained there during the same

time period and who testified in court proceedings on December 11 and 12, 2025 in the Alfonse

D'Amato U.S. Courthouse before the undersigned and Judge Gary Brown. The testimony of

these other ICE detainees who had been held in the Central Islip Hold Room shows that Mr.

Minarcaja Concha's testimony about conditions in that facility are corroborated.

In *Hernández Lazo v. Noem et al*., No. 2:25-cv-06639 (E.D.N.Y.), Felipe

Hernández Lazo appeared in person at the December 12, 2025 hearing on his habeas petition and

testified before this Court with the assistance of a Spanish-language interpreter about the

conditions of his detention in the Central Islip Hold Room.[7] He was detained in the facility on

two separate occasions during the same week: for a nine-hour period on December 2, 2025, and

for another fourteen-hour period spanning December 3 and December 4, 2025. (*Hernandez Lazo*,

No. 2:25-cv-06639, ECF No. 10-1 ¶¶ 2–3, 5–6.) When Mr. Hernández Lazo arrived at the

facility, ICE did not tell him how long he would be detained there. (Hernández Lazo Hr'g Tr.

7:12–14, 19–20.)

Mr. Hernández Lazo was held with five other men in what he estimated to be a six foot

by six foot "cell." (*Id*. 7:22–8:1, 8:6–13, 18–24.) During the day, the six of them sat on cushions

and at night they slept "[c]lose, one right next to each other," without sheets, on three-inch thick

"mattress[es] that you fold in three." (*Id.* 9:4–5, 11–20.) The cell was not cleaned on either of the

two occasions in which Mr. Hernández Lazo was detained in the Central Islip Hold Room, and

---

[7] At the hearing, Respondents stated that they did not have any objections to the Court asking
Mr. Hernández Lazo questions. (Hernández Lazo Hr'g Tr. 7:3–6.) Neither party requested that
Mr. Hernández Lazo be placed under oath. Without objection, the Court relied on Mr. Hernández
Lazo's unsworn statements about certain factual matters during the hearing.

11

the cells in which he was detained "smelled like pee pee, all of it." (*Id.* 10:8–13, 11:13–14.) As was the case for Mr. Minarcaja Concha, the lights were kept on during the entirety of Mr. Hernández Lazo's detention in the Central Islip Hold Room and were not turned off so the men could sleep, even though Mr. Hernández Lazo was detained there during nighttime hours: from 12:22 a.m. to 9:24 a.m. on December 2, 2025, and from 11:38 a.m. on December 3, 2025 to 1:20 a.m. on December 4, 2025. (*Id.* 9:21–10:3; *Hernandez Lazo*, No. 2:25-cv-06639, ECF No. 10-1 ¶¶ 2–3, 5–6.)

On the topic of food and hygiene, Mr. Hernández Lazo testified that while at the Central Islip Hold Room he was provided rice and beans "out of a bag of food." (Hernández Lazo Hr'g Tr. 11:23–25.) When he and his cell mates needed water, they would knock on the door and would be given water. (*Id.* 11:15–22.) Although the toilet had a built-in sink, Mr. Hernández Lazo was not provided with soap, toothpaste, a toothbrush, or other hygiene products. (*Id.* 12:24–13:10.) His cell did not have a shower, and he was not provided access to a shower when detained in the Central Islip Hold Room. (*Id.* 12:21–23.)

ICE permitted Mr. Hernández Lazo to make one call to his family when he was first arrested, but did not permit any additional calls, including a call to his lawyer, at any time during his confinement in the Central Islip Hold Room. (*Id.* 14:14–25, 15:1–24.) After his one call to family, Mr. Hernández Lazo was unable to speak with family again until he was transported to Delaney Hall in New Jersey. (*Id.*) Mr. Hernández Lazo's family were not permitted to visit him in the Central Islip Hold Room. (*Id.* 16:7–15.)

Mr. Hernández Lazo is treated with blood pressure medication, but ICE did not give him his medication during either of the two periods of time when he was detained in the Central Islip Hold Room. (*Id.* 16:24–17:12.) When ICE transferred him to the Nassau County Correctional

Center (the "Nassau County Jail") after his first period of detention in the Central Islip Hold

Room, a check-up revealed that his blood pressure was high at "200." (*Id.* 17:2–18.) Despite this

result, when ICE transferred Mr. Hernández Lazo back to the Central Islip Hold Room on

December 3, 2025, ICE again did not provide him with needed blood pressure medication. (*Id.*

17:9–12.) Mr. Hernández Lazo alerted staff when he arrived at the Central Islip Hold Room that

he took blood pressure medication but none was provided. (*Id.* 19:12–15.)

      In *Clarke v. U.S. Department of Homeland Security, et al.*, a proceeding before Judge

Brown, Erron Anthony Clarke described substantially similar experiences in the Central Islip

Hold Room when he was held there on December 5 to December 6, 2025 and again on

December 9 to December 10, 2025. 2025 WL 3674471, at *3. Like Mr. Hernández Lazo, Mr.

Clarke was held in the Central Islip Hold Room on two separate occasions—the second of which

exceeded 36 hours. *Id.* Mr. Clarke was confined to a single-occupancy room with eight other

men. *Id.* Mr. Clarke, like the petitioners before the undersigned, stated that the facility had no

shower facilities and no beds, that detainees "had to lie straight on the ground," and that ICE did

not provide changes of clothing or toothbrushes. *Id.* Despite being detained overnight—including

for a period of time that exceeded 36 hours—Mr. Clarke testified that the lights remained on

"[a]ll night, all day," and that the nights were "cold." *Id.*

      In response to the Court's order requiring Respondents to address conditions in the

Central Islip Hold Room, Respondents provided a declaration from Achillies Shinas, an ICE

Deportation Officer, consisting of hearsay statements based not on personal knowledge, but on

information gathered from unidentified sources and persons. (*See* Second Shinas Decl. ¶ 2 ("The

following representations are based on my review of Minarcaja-Concha's administrative file,

consultation with my colleagues, and ICE electronic records and databases.").) Shinas attests to

the following:

> 9.  ICE Hold Room facilities such as the one in Central Islip are temporary areas used for post-arrest processing including fingerprinting, completing paperwork, and making transport and bedspace arrangements at long-term detention facilities. Currently, absent extraordinary circumstances, ICE detainees are not kept at Hold Rooms beyond seventy-two hours, and most detainees are transferred out of the Central Islip Hold Room within twenty-four hours.
>
> . . .
>
> 12.  ICE provides detainees with mats to rest on and a change of clothes as needed and/or requested.
>
> 13.  Detainees are provided with phone calls upon arrival and ICE allows additional calls as/if needed. As the facility is a short-term processing space, ICE does not have facilities to accommodate in-person family or attorney visitation.
>
> 14.  Detainees in the Central Islip Hold Room have bathroom access. As a temporary arrest processing space, it does not have showers.

(*Id.* ¶¶ 9, 12–14.)

### E.  <u>Respondents' Violation of the Court's Order to Show Cause and Order to Produce</u>

Mr. Minarcaja Concha's counsel filed the habeas petition initiating this action on

December 3, 2025. (ECF Nos. 1, 2, 3.) At that time, as discussed above, Mr. Minarcaja Concha

was detained in the Central Islip Hold Room.

On December 4, 2025, this Court issued an order prohibiting Respondents from removing

Mr. Minarcaja Concha from the United States and from transferring him to detention outside of

the Eastern District of New York, the Southern District of New York, or the District of New

Jersey. (Order to Show Cause, ECF No. 6.) The Order to Show Cause also set a briefing

schedule on the Petition and scheduled a hearing for December 12, 2025. (*Id.*) Also on December

4, 2025, at around 10:30 a.m., ICE transferred Mr. Minarcaja Concha from the Central Islip Hold Room to the Nassau County Jail in East Meadow, New York. (Second Shinas Decl. ¶ 15.)

During a December 5, 2025 conference with the parties, the Court reminded Respondents of the requirements set forth in the December 4, 2025 Order to Show Cause, including the prohibition on transferring Mr. Minarcaja Concha anywhere outside of the Eastern District of New York, Southern District of New York, or District of New Jersey. (Min. Entry, Dec. 5, 2025.) On December 6, 2025, at around 11:00 p.m., ICE transferred Mr. Minarcaja Concha from the Nassau County Jail to the Elizabeth Contract Detention Facility in Elizabeth, New Jersey. (*Id.* ¶ 17.)

On December 8, 2025, the Court issued an Order to Produce, which directed ICE to physically produce Mr. Minarcaja Concha before the Court for the December 12, 2025 hearing. (Order to Produce, ECF No. 11 at 1.) The Order to Produce noted that if the Court were to conclude that ICE was unlawfully detaining Mr. Minarcaja Concha, the Court would require ICE to immediately process his release from the Alfonse D'Amato U.S. Courthouse. (*Id.* at 2.)

Unbeknownst to the Court, on December 10, 2025, ICE removed Mr. Minarcaja Concha from the Elizabeth Contract Detention Facility and transported him by plane to a location described by Respondents as the "Cibola County Correctional Center" in "Cibola, Texas." (Decl. of Carla Calidonio ("Calidonio Decl.") ¶ 6, ECF No. 21-1.) According to Respondents, ICE took this action upon receiving "bed-space approval from ICE's El Paso Field Office . . . to transfer a large number of detainees to detention facilities in that Field Office's Area of Responsibility." (*Id.* ¶ 4.) While Respondents' filings indicate that Cibola County Correctional Center is located in "Cibola, Texas," *see* ECF No. 21, the Court takes judicial notice of ICE's website, which

indicates that the facility is located in Milan, New Mexico.[8] *See Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 262 (S.D.N.Y.), *aff'd*, 788 F. App'x 85 (2d Cir. 2019) (taking judicial notice of information available on an official government website); *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166–67 (S.D.N.Y. 2015) (same). The Court further takes judicial notice that there does not appear to be a municipality in Texas named "Cibola."

Despite the fact that ICE had already transported Mr. Minarcaja Concha to New Mexico in violation of the Order to Show Cause, Respondents submitted the December 11, 2025 Shinas declaration in which Shinas attests that Mr. Minarcaja Concha "remains detained [at Elizabeth Contract Detention Facility] in compliance with this Court's Order." (Second Shinas Decl. ¶ 17; *see also* Calidonio Decl. ¶ 6.) As noted previously, the Shinas declaration consists of hearsay statements based not on personal knowledge, but on information gathered from unidentified sources and persons.

On the morning of the December 12, 2025 hearing, ICE contacted the undersigned's Courtroom Deputy to report that Mr. Minarcaja Concha would not be produced in-person for the hearing that day. (*See* Elec. Order, Dec. 12, 2025.) Mr. Minarcaja Concha instead joined the hearing by telephone from the Cibola Country Correctional Center. (*See* Hr'g Tr. 7:3–19:14.)

## II.    Procedural History

As noted, on December 3, 2025, counsel filed the instant Petition seeking a writ of habeas corpus directing Respondents to release Mr. Minarcaja Concha following his sudden arrest and

---

[8] *See Cibola County Correctional Center*, U.S. Immigrations and Customs Enforcement, https://www.ice.gov/detain/detention-facilities/cibola-county-correctional-center (last visited Jan. 26, 2026) (listing facility address as 2000 Cibola Loop, Milan, New Mexico 87021 United States).

detention by ICE earlier that day. (*See* Pet.) Three exhibits were filed in support: (1) a Notice to Appear, a Form I-200, Warrant for Arrest of Alien, and a Notice of Custody Determination, all dated July 18, 2022 (ECF No. 2-1); (2) the July 19, 2022 Order of Release on Recognizance (ECF No. 2-2); and (3) a Biometrics Appointment Notice for a January 3, 2024 appointment (ECF No. 2-3). The Petition is also accompanied by a proposed order to show cause that would direct Respondents to show why the Petition "should not be granted." (ECF No. 1-1 ¶ 1.)

On December 4, 2025, the Court issued the Order to Show Cause, which among other things, ordered that Respondents show cause why the Petition should not be granted and barred Mr. Minarcaja Concha's removal from the United States and transfer out of the Eastern District of New York, the Southern District of New York, or the District of New Jersey absent further order of this Court. (Order to Show Cause at 2–3.) That same day, the Court ordered the parties to appear for a telephone conference on December 5, 2025 to address the status of Mr. Minarcaja Concha's detention. (Elec. Order, Dec. 4, 2025.)

During the December 5, 2025 teleconference with the Court, Respondents reported that Mr. Minarcaja Concha was being held in the Nassau County Jail. (*See* Min. Entry, Dec. 5, 2025.) Respondents stated that they could not confirm whether he would continue to be detained there or would be transferred elsewhere prior to the December 12, 2025 hearing. (*See id.*) The Court reminded Respondents of the Order to Show Cause prohibiting ICE from transferring Mr. Minarcaja Concha to any facility outside of the three enumerated federal judicial districts. (*See id.*)

On December 8, 2025, the Court issued the Order to Produce, requiring Mr. Minarcaja Concha "to be brought under safe and secure custody" before this Court for the Show Cause hearing on December 12, 2025. (Order to Produce, ECF No. 11, at 1.)

Respondents submitted their response in opposition to the Petition on December 10, 2025, and attached the declaration of Achillies Shinas. (*See* Resp.; First Shinas Decl.) Although the Response and First Shinas Declaration referred to certain documents, neither attached any of those documents as exhibits. (*See id*.) Mr. Minarcaja Concha submitted a reply the same day. (Reply, ECF No. 16.)

Upon review of Respondents' response to the Petition, on December 10, 2025, the Court required Respondents to file a supplemental submission:

> 1. Identifying the period of time during which Mr. Minarcaja Concha was detained in 535 Federal Plaza on December 3, 2025 and December 4, 2025.

> 2. Providing legal authority, if any, addressing the basis for detaining Mr. Minarcaja Concha at 535 Federal Plaza . . .

> 3. Describing what sleeping accommodations, food, access to showers and bathroom facilities, access to medications, medical screening, counsel, and family visitation were provided to Mr. Minarcaja Concha during the time he was detained at 535 Federal Plaza; and

> 4. Indicating whether Respondents plan to detain Mr. Minarcaja Concha at 535 Federal Plaza at any other time prior to his Show Cause hearing . . .

(Elec. Order, Dec. 10, 2025.) The Court also required Respondents to submit the documents referenced in their response to the Petition, including:

> 1. The December 3, 2025 Form I-200 Warrant for Arrest.

> 2. All records substantiating the facts set forth in Paragraphs 11 and 12 of the Shinas Declaration . . . including: (a) records documenting the arrest of Petitioner on September 30, 2025 and November 17, 2025 by the New York City Police Department; (b) the associated charges; and (c) the disposition of the charges, including any subsequent dismissals and/or convictions.

> 3. All records relating to "the reporting requirements of [Petitioner's] ROR" between July 18, 2022 to present . . . and

> 4. All records relating to any individualized custody determination relating to Petitioner made by a DHS officer prior to or contemporaneously with his arrest, including but not

18

limited to the "determin[ation] that Petitioner's release under the ROR should be revoked because his multiple arrests violated the conditions of the ROR."

(*Id*.)

On December 11, 2025, Respondents filed a letter addressing Mr. Minarcaja Concha's detention in Central Islip, the Second Shinas Declaration, and accompanying documentation. Attached as exhibits are the following documents:

- a July 18, 2022 Notice to Appear (ECF No. 19-2 at 1–4);
- the July 19, 2022 ROR (*id*. at 5–8);
- the July 18, 2022 Notice of Custody Determination (*id*. at 9–10);
- the July 18, 2022 Form I-200, Arrest Warrant (*id*. at 11–12);
- a July 18, 2022 Report of Deportable/Inadmissible Alien (*id*. at 13–16);
- a July 19, 2022 Alternatives to Detention (ATD) Enrollment form (*id*. at 17–18);
- NYPD database records pertaining to Mr. Minarcaja Concha's arrests on September 30, 2025 and November 17, 2025 (*id*. at 19–24);
- a December 3, 2025 Form I-200, Arrest Warrant (*id*. at 25–26);
- a December 3, 2025 Report of Deportable/Inadmissible Alien (*id*. at 27–30);
- a second December 3, 2025 Form I-200, Arrest Warrant (*id*. at 31–32); and
- a Form 1815, Notice of Fee Assessment (*id*. at 33–37).

In the Second Shinas Declaration, Shinas attests that ICE received the information about Mr. Minarcaja Concha's arrests in New York City from unidentified "law enforcement databases," and that Mr. Minarcaja Concha had informed ICE that the charges from his first arrest had been dismissed by providing a "letter from the court." (Second Shinas Decl. ¶¶ 5–7.) In this second declaration, Shinas corrects the statement in his prior declaration that the disposition of the New York City arrests were "unknown." (*Id*. ¶ 6.)

As noted above, after ICE contacted the undersigned's Courtroom Deputy on the morning of December 12, 2025 to indicate that it would not physically produce Mr. Minarcaja Concha for the hearing that day, the Court issued an Order reporting this communication. (*See* Elec. Order, Dec. 12, 2025.) The Court ordered Respondents to explain why Mr. Minarcaja

Concha was not being physically produced before the Court and why Respondents should not be sanctioned for their noncompliance with the Court's Order to Produce. (*See id*.)

Shortly before the hearing that afternoon, Respondents submitted a letter reporting that Mr. Minarcaja Concha had been transferred to El Paso, Texas and providing a declaration from ICE Assistant Field Office Director Carla Calidonio. (Calidonio Decl.) The Calidonio Declaration consists of hearsay statements based not on personal knowledge, but on information gathered from unidentified sources and persons. (*See* Calidonio Decl. ¶ 2 ("The following representations are based on consultation with my colleagues, and review of ICE electronic records and databases.").) Calidonio attests that on December 10, 2025—six days after issuance of the Court's Order to Show Cause restricting Respondents' transfer of Mr. Minarcaja Concha—ICE transferred him to Texas pursuant to "approval from ICE's El Paso Field Office (ERO-El Paso) to transfer a large number of detainees to detention facilities in that Field Office's Area of Responsibility." (*Id*. ¶ 6.) Calidonio asserts that the transfer was "inadvertent[]" and acknowledges that, before the transfer, ICE had received notice of the Court's Order to Show Cause restricting Mr. Minarcaja Concha's transfer. (*Id*. ¶¶ 3, 6.) According to Calidonio, "it is unknown why the notation indicating that there was a court order in place did not result in the Petitioner being removed from the scheduled transfer." (*Id*. ¶ 5.) Calidonio states that ICE databases did not update to reflect the transfer until December 12, 2025, two days after the transfer occurred; accordingly, ICE had not realized that Mr. Minarcaja Concha had been "inadvertently . . . transferred" until December 12, 2025. (*Id*. ¶¶ 6, 8.)

At the December 12, 2025 hearing, the Court heard Mr. Minarcaja Concha's testimony about his detention in the Central Islip Hold Room and argument from counsel for the parties. (Min. Entry & Order, Dec. 12, 2025, ECF No. 22.) Considering the parties' written and oral

arguments and submissions, the Court granted Mr. Minarcaja Concha habeas relief for the reasons explained on the record, which the Court indicated would be set forth in more detail in this written Opinion and Order. (*Id.*) The Court further ordered Respondents to transport Mr. Minarcaja Concha back to the Eastern District of New York for release and required the parties to appear for a telephone conference on December 13, 2025 to address the status of Respondents' compliance with this order. (*Id.*)

On December 13, 2025, Respondents filed letter submissions confirming that (1) arrangements to return Mr. Minarcaja Concha from Texas were underway, and that (2) Mr. Minarcaja Concha was anticipated to arrive in the Eastern District in New York at around 9:45 p.m. that day. (*See* ECF Nos. 23, 24.) At the telephone conference with the Court that day, Respondents represented that Mr. Minarcaja Concha was scheduled to arrive in Suffolk County at around 9:45 p.m. and would be released upon arrival. (*See* Min. Entry, Dec. 13, 2025.) Regarding Respondents' violation of two Court orders in transporting Mr. Minarcaja Concha to New Mexico, Mr. Minarcaja Concha's counsel requested time to consult with him to determine whether Mr. Minarcaja Concha sought to pursue a motion for contempt. (*See id.*) Respondents asserted that the transfer of Mr. Minarcaja Concha to the Cibola County Correctional Center was a mistake. The Court scheduled a January 5, 2026 conference to address whether there would be contempt proceedings in this matter. (*See id.*)

Mr. Minarcaja Concha arrived in the Eastern District of New York and was released by the end of the day on December 13, 2025. (ECF No. 25.)

## LEGAL STANDARD

The Petition for a writ of habeas corpus is filed under 28 U.S.C. § 2241, which "authorizes a district court to grant a writ of habeas corpus whenever a petitioner is 'in custody

in violation of the Constitution or laws or treaties of the United States.'" *Wang v. Ashcroft*, 320

F.3d 130, 140 (2d Cir. 2003) (quoting 28 U.S.C. § 2241(c)(3)); *see also Hechavarria v. Sessions*,

891 F.3d 49, 53 (2d Cir. 2018). Federal courts have jurisdiction to hear habeas corpus claims by

noncitizens challenging the constitutionality of their detention. *Velasco Lopez v. Decker*, 978

F.3d 842, 850 (2d Cir. 2020); *see also Hechavarria*, 891 F.3d at 53 ("[A]t its historical core, the

writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and

it is in that context that its protections have been strongest."). Additionally, "[c]laims that the

discretionary process [used to detain someone] . . . was constitutionally flawed are cognizable in

federal court on habeas because they fit comfortably within the scope of § 2241." *Velasco Lopez*,

978 F.3d at 850.

## DISCUSSION

As noted, the Court incorporates by reference the entirety of its Opinion and

Order in *Rodriguez-Acurio v. Almodovar*, __ F. Supp. 3d __, No. 25-cv-6065, 2025 WL

3314420 (E.D.N.Y. Nov. 28, 2025), and provides this additional analysis to explain the relevance

of specific facts in the record relating to Mr. Minarcaja Concha. The Court also notes that since

its decision in *Rodriguez-Acurio*, the first Court of Appeals decision to weigh in preliminarily on

the interpretation of Section 1225(b)(2) that Respondents advanced here has tentatively rejected

Respondents' argument:

> [T]he mandatory detention provision upon which Defendants rely, limits its scope to
> an "applicant for admission" who is "seeking admission," § 1225(b)(2)(A). Put another
> way, "U.S. immigration law authorizes the Government to detain certain aliens *seeking
> admission* into the country under §§ 1225(b)(1) and (b)(2). It also authorizes the
> Government to detain certain aliens *already in the country* pending the outcome of
> removal proceedings under §§ 1226(a) and (c)."

*Castanon-Nava v. U.S. Dep't of Homeland Sec.*, 161 F.4th 1048, 1061 (7th Cir. 2025) (emphasis

in original, quoting *Jennings v. Rodriguez*, 583 U.S. 281, 289 (2018)).

I.    **Statutory Framework**

As noted, the Court's detailed opinion in *Rodriguez-Acurio v. Almodovar* is entirely incorporated by reference, including the Court's explanation of the statutory framework for removing noncitizens from the United States through removal and expedited removal proceedings, ICE's mandatory and discretionary detention of noncitizens under the INA, and the release of applicants for admission detained under 8 U.S.C. § 1225(b)(1) or (b)(2) "temporarily . . . [on parole] for urgent humanitarian reasons or significant public benefit" pursuant to 8 U.S.C. § 1182(d)(5)(A), which is known as the humanitarian parole statute ("Section 1182(d)(5)(A)"). *See Rodriguez-Acurio*, 2025 WL 3314420, at *8–11.

II.    **Analysis**

The Petition seeks a writ of habeas corpus "directing Respondents to release Petitioner." (Pet. at 11.) It argues that ICE's detention violates Mr. Minarcaja Concha's right to procedural and substantive due process because he was arrested and detained by ICE without notice and an opportunity to be heard, in violation of the Fifth Amendment to the U.S. Constitution. Mr. Minarcaja Concha maintains that he never received an "individualized custody determination" regarding whether he poses a flight or public safety risk.

Respondents argue that the detention is lawful for three reasons. First, they contend that Mr. Minarcaja Concha's detention is governed by the mandatory detention provision of Section 1225(b)(2), not the Section 1226 discretionary detention framework, and that under the "entry fiction," Mr. Minarcaja Concha has no right to any additional process than what Section 1225(b)(2) affords. (Resp. at 10–12.) Second, Respondents contend that Mr. Minarcaja Concha's arguments against his detention amount to a request to "equitably estop" ICE from detaining him under Section 1225(b)(2). (*Id*. at 25–27.) Finally, Respondents argue that Mr. Minarcaja Concha

suffered no violation of his right to procedural due process because (1) the ROR provided him

"notice" that failure to comply with the condition of not committing a crime could result in his

re-detention and (2) his 2025 arrests by the NYPD constituted a valid basis to revoke his release.

(*Id.* at 27–28.) For the reasons explained below, contrary to Respondents' contentions, Mr.

Minarcaja Concha's detention does not fall under the mandatory detention provision of Section

1225(b)(2) based on the statutory text. As addressed in detail in *Rodriguez-Acurio*, Respondents'

framing of this Court's reasoning as one premised on the doctrine of "equitable estoppel" is

inaccurate. *See Rodriguez-Acurio*, 2025 WL 3314420, at *18 n.10. Accordingly, Mr. Minarcaja

Concha is necessarily detained pursuant to Section 1226(a), and his detention by ICE without

any notice or opportunity to be heard violates his rights to procedural due process under the Fifth

Amendment. Considering Mr. Minarcaja Concha's weighty liberty interests alongside

Respondents' interests in enforcing immigration laws and the substantial risk of erroneous

deprivation stemming from Respondents' arrest and detention of Mr. Minarcaja Concha and

revocation of his ROR without any notice or opportunity to be heard, Mr. Minarcaja Concha's

detention violates his right to procedural due process.

**A.** **Mr. Minarcaja Concha is Detained Under Section 1226(a), not Section 1225(b)(2)**

Respondents invoke Section 1225(b)(2) as a basis for Mr. Minarcaja Concha's detention,

arguing that he "falls squarely within the ambit" of the statute's mandatory detention

requirement. (Resp. at 13.)

Section 1225(b)(2)(A) provides that "in the case of an alien who is *an applicant for*

*admission*, if the examining immigration officer determines that an alien *seeking admission* is not

*clearly and beyond a doubt entitled to be admitted*, the alien shall be detained for a proceeding

under section 1229a." 8 U.S.C. § 1225(b)(2)(A) (emphasis added). As other courts have

recognized, this language requires that "several conditions must be met" to impose mandatory detention under Section 1225(b)(2). *Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 487 (S.D.N.Y. 2025). The noncitizen must be: "(1) an applicant for admission; (2) seeking admission; and (3) not clearly and beyond a doubt entitled to be admitted." *Id.*; *Martinez v. Hyde*, 792 F. Supp. 3d 211, 214 (D. Mass. 2025).

It is undisputed that Mr. Minarcaja Concha is "an applicant for admission" and that he is "not clearly and beyond a doubt entitled to be admitted." Instead, the question here is whether he is "seeking admission" such that he is subject to mandatory detention under Section 1225(b)(2)(A).

This Court finds that he is not. Mr. Minarcaja Concha cannot be "seeking admission" because he clearly is not presenting himself at the border and was not recently apprehended just after entering this country. He has been living in the United States since 2022. (Pet. ¶ 1.) Respondents do not identify any active process of seeking admission attributable to Mr. Minarcaja Concha. While he does have an application for asylum pending, as did the petitioner in *Rodriguez-Acurio*, such an application only demonstrates that Mr. Minarcaja Concha seeks "a lawful means to remain here," "not 'admission' or 'lawful entry' to the United States." *Rodriguez-Acurio*, 2025 WL 3314420, at *22.

Respondents argue that because Mr. Minarcaja Concha is an "applicant for admission," he is "inherently and necessarily 'seeking admission,'" and that he therefore satisfies all three Section 1225(b)(2) criteria. (Resp. at 16.) This Court has already addressed and rejected Respondents' interpretation in *Rodriguez-Acurio*, 2025 WL 3314420, at *22–23, including Respondents' invocation of *Jennings v. Rodriguez*, 583 U.S. 281 (2018). The determination that ICE's detention of Mr. Minarcaja Concha is governed by Section 1226(a) is supported by the

fact that ICE released him on his own recognizance in July 2022. (*See* ECF No. 2-2.) People detained under Section 1225(b) are ineligible for release on recognizance. *See Jennings*, 583 U.S. at 300 (concluding that, other than parole, "there are no *other* circumstances under which aliens detained under § 1225(b) may be released" (emphasis in original)).

Because Section 1225(b)(2) does not govern Mr. Minarcaja Concha's detention, for all of the reasons explained above, his detention falls under Section 1226(a).[9]

Section 1226(a) "authorizes the Government to detain certain aliens already in the country pending the outcome of removal proceedings." *Jennings*, 583 U.S. at 289. It applies when a noncitizen is "arrested and detained" "[o]n a warrant issued by the Attorney General." 8 U.S.C. § 1226(a). That is precisely what occurred here. On December 3, 2025, ICE officers arrested Mr. Minarcaja Concha using a DHS Form I-200 Warrant for Arrest of Alien issued pursuant to Section 1226(a). The face of that warrant explicitly states that an immigration officer issued the warrant "pursuant to sections 236 and 287 of the Immigration and Nationality Act" and part 287 of title 8 of the Code of Federal Regulations. Those sections correspond to 8 U.S.C. §§ 1226, 1357 and 8 C.F.R. 287.1–287.12. *See Rodriguez-Acurio*, 2025 WL 3314420, at *23– 24. Moreover, several days after Mr. Minarcaja Concha first arrived in the United States, he was served with a July 18, 2022 arrest warrant, which indicated that he was "liable to being taken into custody as authorized by section 236 of the Immigration and Nationality Act," which is an explicit reference to Section 1226. (ECF No. 2-1 at 4.)

Although not dispositive standing alone, Mr. Minarcaja Concha's arrest on warrants invoking Section 1226 on July 18, 2022 and December 3, 2025, supports the conclusion that his

---

[9] Respondents do not contend that Mr. Minarcaja Concha is detained pursuant to 8 U.S.C. § 1225(b)(1) ("Section 1225(b)(1)") or 8 U.S.C. § 1226(c) ("Section 1226(c)"). (Hr'g Tr. 32:18– 23.)

2025 detention is governed by Section 1226(a)'s discretionary framework. *See Sampiao v. Hyde*, No. 25-cv-11981, 2025 WL 2607924, at *1 (D. Mass. Sept. 9, 2025) (holding that to mandate the petitioner's detention "in these circumstances would contravene Congress's intent that Section 1226(a)'s discretionary detention framework apply to all noncitizens arrested on a warrant except those subject to Section 1226(c)'s carve out"); *dos Santos v. Noem*, No. 25-cv-12052, 2025 WL 2370988, at *7 (D. Mass. Aug. 14, 2025) ("Section 1225(b)(2) does not apply to noncitizens who are arrested on a warrant issued by the Attorney General while residing in the United States.").

### B.  <u>Procedural Due Process</u>

The Fifth Amendment guarantees that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. When evaluating a procedural due process claim, there are "two elements: (1) the existence of a property or liberty interest that was deprived and (2) deprivation of that interest without due process." *Radwan v. Manuel*, 55 F.4th 101, 123 (2d Cir. 2022); *see also Nnebe v. Daus*, 931 F.3d 66, 80 (2d Cir. 2019).

### i.  *ICE's Detention of Mr. Minarcaja Concha Infringes on his Protected Liberty Interest*

Mr. Minarcaja Concha argues that ICE's detention of him infringes on his protected interest in liberty, triggering a right to procedural due process. Respondents rely on the Supreme Court's decision in *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103 (2020), and other cases to argue that because Mr. Minarcaja Concha is an applicant for admission to the United States, "'the Due Process Clause provides nothing more' than the procedural protections set forth in 8 U.S.C. § 1225." (Resp. at 11 (quoting *Thuraissigiam*, 591 U.S. at 139–40).)

Respondents advanced the same arguments in *Rodriguez-Acurio*, and this Court has already carefully considered and addressed them in ruling on the habeas petition in that action. *See Rodriguez-Acurio*, 2025 WL 3314420, at *26–27. In summary, as a preliminary matter, Mr.

Minarcaja Concha is not detained pursuant to Section 1225(b)(2); accordingly, his detention is governed by Section 1226(a), and he is entitled to the protections afforded by that statute—not just the procedures afforded under Section 1225(b)(2). Moreover, "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. The Due Process Clause "covers noncitizens, whether their presence here is lawful, unlawful, temporary, or permanent." *Velasco Lopez*, 978 F.3d at 850; *see also Yamataya v. Fisher*, 189 U.S. 86, 100–01 (1903) (noncitizen who entered the country in violation of the law cannot be "deprived of [her] liberty" without receiving "due process of law"). In habeas proceedings concerning executive detention, courts must conduct "the most searching review" to ensure the legality of detention that "occur[s] without the procedural protections required in courts of law." *Velasco Lopez*, 978 F.3d at 850–51.

*Thuraissigiam* does not support Respondents' position that Mr. Minarcaja Concha has no rights to due process beyond what is afforded by Section 1225 because that decision "stands for the limited principle that those 'at the threshold of entry' stand on a different footing for due process purposes than noncitizens 'who have established connections in this country.'" *Rodriguez-Acurio*, 2025 WL 3314420, at *26 (quoting *Thuraissigiam*, 591 U.S. at 107). ICE released Mr. Minarcaja Concha on his own recognizance just days after he entered the United States in 2022. Since then, he has continuously resided in New York for more than three and a half years, has developed deep community ties in this country, where his wife and daughter reside and where he works in construction, and was granted five years of work authorization from 2024 to 2029. Accordingly, the scope of Mr. Minarcaja Concha's rights to procedural due process are not analogous to those of Thuraissigiam, who was stopped within 25 yards of the

28

border. *Thuraissigiam*, 591 U.S. at 11. As addressed in *Rodriguez-Acurio*, the cases on which Respondents rely, including *Thuraissigiam*, are therefore distinguishable. 2025 WL 3314420, at *26 n.17 (distinguishing cases cited by Respondents in support of proposition that a non-citizen residing in the interior of the United States has no right to due process beyond the procedures required by Section 1225).

Respondents contend that the entry fiction applies to "aliens with sympathetic claims, including those . . . with significant ties to this country." (Resp. at 11.) They miss the point. The issue here is not whether Mr. Minarcaja Concha has a "sympathetic" claim. Rather, Respondents rely on *Thuraissigiam* for the notion that Mr. Minarcaja Concha has no right to due process beyond that which is provided under the terms of Section 1225. That argument does not hold water both because Mr. Minarcaja Concha's detention is governed by Section 1226(a) and because the cases on which Respondents rely, including *Thuraissigiam*, are distinguishable for the reasons explained in *Rodriguez-Acurio*.

Accordingly, Mr. Minarcaja Concha has a liberty interest in being free from detention that is afforded procedural due process protection. ICE's detention of Mr. Minarcaja Concha, which commenced on December 3, 2025, and did not end until ICE released him in response to this Court's December 12, 2025 oral order granting the Petition, necessarily infringed on that liberty interest.

### ii. *Respondents Did Not Provide Mr. Minarcaja Concha Adequate Notice and an Opportunity to be Heard.*

Courts apply the *Mathews v. Eldridge* balancing test "when determining the adequacy of process in the context of civil immigration confinement." *Munoz Materano v. Artera*, __ F. Supp. __, No. 25-cv-6137, 2025 WL 2630826, at *12 (S.D.N.Y., Sept. 12, 2025). Under that test, a court's determination of what procedures are required under the Fifth Amendment

involves considering: (1) the private interest that will be affected by the official action; (2) the risk of erroneous deprivation of that interest through the procedures used; and (3) the government's interest, including the fiscal and administrative burdens that the additional or substitute procedures would entail. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Applying this balancing test, Respondents' detention of Mr. Minarcaja Concha from December 3, 2025 until December 13, 2025, when ICE released him pursuant to this Court's order, violated his Fifth Amendment rights to procedural due process.

### 1.  Private Interest

With respect to the first factor, Mr. Minarcaja Concha invokes "the most significant liberty interest there is—the interest in being free from imprisonment." *Velasco Lopez*, 978 F.3d at 851. The liberty interest in freedom from detention "is even more sharply pronounced where an individual was released from detention on the condition that he comply with certain conditions (as petitioner was here), the individual in fact complies with those requirements (as petitioner did here), and the individual 'thus relied on the government's implicit promise that his release will be revoked only if he fails to live up to those conditions." *Y- C- v. Kenneth Genalo, et al.*, 2025 WL 3653496, at *6 (E.D.N.Y. Dec. 17, 2025) (quoting *Savane v. Francis*, 2025 WL 2774452, at *9 (S.D.N.Y. Sept. 28, 2025)).

On December 3, 2025, ICE officers detained Mr. Minarcaja Concha without any notice, explanation, or an opportunity to be heard, and held him in the Central Islip Hold Room and subsequent detention facilities in New York, New Jersey, and New Mexico, separating him from his wife and daughter and preventing him from working in construction, as USCIS has authorized him to do. Before ICE suddenly arrested him in 2025, Mr. Minarcaja Concha had

been released on his own recognizance for more than three and a half years and had appeared for his ICE supervision appointments and immigration court hearings.

While detained in the Central Islip Hold Room for around twenty-four hours, Mr. Minarcaja Concha was not only deprived of his freedom, he was confined in a small, crowded room, no more than six feet by six feet,[10] shared with approximately seven or eight people who slept and ate next to an open toilet, used the toilet without privacy, and lacked access to bedding, showers, soap, toothpaste, a toothbrush, and a clean change of clothing. ICE did not permit him to speak or meet with his lawyer or family, despite his pending habeas petition and immigration court proceedings. Moreover, although the twenty-four-hour period of his detention included nighttime hours, the lights in the room remained on at all times, impeding sleep.

As Judge Brown observed, the conditions in the Central Islip Hold Room violate ICE's own minimum standards for such facilities, which were established "to ensure the safe and humane treatment of detainees." *Clarke*, 2025 WL 3674471, at *7. For example, the rooms used to hold Mr. Minarcaja Concha, Mr. Hernández Lazo, and Mr. Clarke were each designed to hold a *single* detainee for several hours at a time. *Id.* at *3, *7. Yet, these rooms are being used to detain anywhere from six to *nine* detainees for extended periods of time, including periods lasting twenty-four hours or more.[11] (*Id.*; Hr'g Tr. 9:3–7; Hernández Lazo Hr'g Tr. 8:6–10.)

_____

[10] Mr. Minarcaja Concha testified that the room in which he was detained in the Central Islip Hold Room was four feet by four feet, while Mr. Hernández Lazo described being detained in a room that was six feet by six feet. (Hr'g Tr. 9:3–10; Hernández Lazo Hr'g Tr. 7:22–8:1.) The discrepancy may be explained by Mr. Minarcaja Concha's testimony that there are around four different rooms (Hr'g Tr. 13:15–18), or the fact that Mr. Minarcaja Concha was detained with six or seven other people, whereas Mr. Hernández Lazo was detained with five others. (Hr'g Tr. 9:3–10; Hernández Lazo Hr'g Tr. 8:6–13.)

[11] Moreover, ICE's decision to house detainees overnight in the Central Islip facility appears to contravene "the Suffolk County Bargain and Sale Deed conveying the land on which the

Thus, as Judge Brown observed, "ICE has been deploying its 'holding rooms' in a manner that shocks the conscience . . . it appears that the conditions maintained at the Central Islip hold room, given the recklessly expanded use of these facilities by ICE, may well violate constitutional requisites." 2025 WL 3674471, at *6.

The fact that Mr. Minarcaja Concha was detained in such conditions for even part of his detention by ICE underscores why freedom from detention is a precious liberty afforded protection under the Due Process Clause of the Fourteenth Amendment to our Constitution. Accordingly, ICE's detention of Mr. Minarcaja Concha from December 3, 2025 through December 12, 2025—the date of this Court's order requiring his release—infringed on his weighty private interest in personal liberty.

## 2. Risk of Erroneous Deprivation

There is a high risk of erroneous deprivation through the procedures used to detain Mr. Minarcaja Concha. Respondents did not provide him with any notice or any opportunity to be heard before a DHS officer or immigration judge before ICE detained him on December 3, 2025. For the same reasons set forth fully in *Rodriguez-Acurio*, there is a high risk of erroneous deprivation of liberty in detaining Mr. Minarcaja Concha without any notice or opportunity to be heard. *See* 2025 WL 3314420, at *29–30. There is little cost and significant benefit from providing the procedural safeguard of requiring that any detention be preceded by an individualized determination by a DHS officer as to whether Mr. Minarcaja Concha poses a flight or safety risk. *See id.*; *Lopez Benitez*, 795 F. Supp. 3d at 495; *Hyppolite v. Noem*, No. 24-

Courthouse in Central Islip [ ] sits to the federal government," which provides that "[t]he Federal Courthouse and Federal Building *shall not be designed or altered for the overnight housing and/or custody of prisoners or detainees*." (*See* Elec. Order, Dec. 10, 2025 (citing *USA v. Deonarain*, 2:25-cr-00210 (E.D.N.Y.), ECF Nos. 29 and 21-1) (emphasis added).)

cv-4304, 2025 WL 2829511, at *13–14 (E.D.N.Y. Oct. 6, 2025) (finding an "extremely high" risk of erroneous deprivation where a person is detained under Section 1226(a) without any pre-deprivation notice or an opportunity to be heard).

Respondents point to the condition of Mr. Minarcaja Concha's 2022 ROR that prohibits him from violating the law and contend that this document provided him "notice" that "[f]ailure to comply with the conditions of [that] order may result in revocation of [his] release and [his] arrest and detention by Immigration and Customs Enforcement." (Resp. at 28; *see also* ECF No. 2-2 at 1.) According to Respondents, Mr. Minarcaja Concha's ROR was properly revoked because "his arrests [in New York City] violated the conditions of his ROR." (Resp. at 28.) This argument is unpersuasive because Respondents fail to show that Mr. Minarcaja Concha violated *any* condition of his ROR, much less the requirement to not violate any local, state or federal law. The record shows that one of the two arrests of Mr. Minarcaja Concha in 2025 resulted in a dismissal of all charges and that the other arrest has not resulted in any reported disposition, much less a conviction. On this record, Respondents' reliance on the 2025 New York City arrest reports is simply a post-hoc attempt to justify ICE's decision to arrest and detain Mr. Minarcaja Concha on December 3, 2025. Significantly, Mr. Minarcaja Concha was not served with *any* document that even accused him of violating any conditions of his ROR, much less one that was prepared before ICE arrested and detained him.

Significantly, in their first response to the Court's Order to Show Cause, Respondents claimed that the status of the charges related to the two New York arrests was "unknown." (*See* First Shinas Decl. ¶¶ 11–12.) After this Court ordered Respondents to provide supplemental information about Respondents' claim that the arrests demonstrated a violation of the ROR, Respondents' declarant corrected misstatements in his first declaration. (*See* Second Shinas Decl.

¶ 6 (noting that on October 23, 2025, Mr. Minarcaja Concha provided ICE a letter of dismissal of his first set of charges, which required correction of the statement in the prior declaration "that the disposition is unknown as my review was based on the lack of disposition on the [sic] Minarcaja's RAP sheet.").) The status of the charges relating to Mr. Minarcaja Concha's second arrest, which are substantially similar to those of his first arrest, remains unknown. (Hr'g Tr. 23:15–22, 25:23–26:4.) Respondents concede that they did not conclude at any point that Mr. Minarcaja Concha was convicted of either the two misdemeanor charges arising from the two New York arrests. (*Id*. 25:4–7.)

Respondents also acknowledge that they did not make any individualized determination that Mr. Minarcaja Concha violated the conditions of his ROR. (Hr'g Tr. 28:23–29:12.) The closest approximation, in their view, is a one-sentence statement in his Report of Deportable/Inadmissible Alien that reads as follows: "DISPOSITION: MINARCAJA-CONCHA was processed as re-arrest as he violated the terms of his ROR/ATD release due to his recent arrests." (Hr'g Tr. 31:21–32:7; *see also* ECF No. 19-2 at 30.) This is insufficient because, as explained above, it does not provide any factual or legal basis for concluding that Mr. Minarcaja Concha's arrests constituted a violation of the ROR, nor any indication that the arrests suggested that he was a flight or public safety risk. Additionally, such a statement was prepared concurrently with the processing of his arrest, not prior to the arrest.

Therefore, ICE's detention of Mr. Minarcaja Concha without any notice or opportunity to be heard, including any individualized assessment into whether he poses a flight or public safety risk, such as "any change in circumstances" since his July 2022 release on recognizance establishes a high risk of erroneous deprivation of his protected liberty interest in freedom from detention. *See Rodriguez-Acurio*, 2025 WL 3314420, at *29–30.

          3.   *The Government's Interest in Detaining Mr. Minarcaja Concha Without a Hearing*

Here, Respondents have not addressed any of the *Matthews v. Eldridge* factors, much less any government interests advanced by ICE's detention of Mr. Minarcaja Concha without notice or an opportunity to be heard.

Although the Attorney General may have a legitimate government interest in ensuring the appearance of noncitizens at immigration proceedings and preventing danger to the community, there is absolutely nothing in the record showing that Mr. Minarcaja Concha is a flight risk or a danger to the community or that anything has changed since 2022. ICE's 2022 decision to release Mr. Minarcaja Concha on his own recognizance, conditioned on his enrollment in the ATD program, necessarily involved the determination that he posed no flight or public safety risk that could not be mitigated by electronic monitoring. *See* 8 C.F.R. § 1236.1(c)(8); *see also Velasco Lopez*, 978 F.3d at 854 (holding that "the Attorney General's discretion to detain individuals under [Section 1226(a)] is valid where it advances a legitimate governmental purpose," such as "ensuring that noncitizen[s] do not abscond and . . . ensuring they do not commit crimes"); *Lopez Benitez*, 795 F. Supp. 3d at 496. Moreover, after several months, ICE removed the electronic monitoring requirement, underscoring that it agreed that Mr. Minarcaja Concha did not pose a safety or flight risk. Respondents therefore fail to demonstrate that ICE's detention of Mr. Minarcaja Concha without any notice or opportunity to be heard advances *any* legitimate government interests.

* * *

Weighing all of the *Mathews v. Eldridge* factors—the significant liberty interest at stake, the high risk of erroneous deprivation, and Respondents' failure to demonstrate that Mr.

Minarcaja Concha's detention was required to advance any legitimate government interest in ensuring appearance at removal proceedings or preventing danger to the community— Respondents' detention of Mr. Minarcaja Concha with no notice or opportunity to be heard and no showing of changed circumstances following release on parole violates his Fifth Amendment rights to procedural due process. *See, e.g.*, *Rodriguez-Acurio*, 2025 WL 3314420, at *25–31; *Lopez Benitez*, 795 F. Supp. 3d at 496; *Huamani Tumba v. Francis*, No. 25-cv-6065, 2025 WL 3079014, at *9 (E.D.N.Y. Nov. 28, 2025).

Because the Court finds that Respondents' detention of Mr. Minarcaja Concha violates his rights to procedural due process, it declines to reach his Fifth Amendment substantive due process claim.

## III. Remedy

As addressed at length in *Rodriguez-Acurio*, upon finding a constitutional violation, a district court "may" grant a writ of habeas corpus and "dispose of the matter as law and justice require." 28 U.S.C §§ 2241(a), 2243. Release from detention is the "typical remedy" for "unlawful executive detention." *Munaf v. Green*, 553 U.S. 674, 693 (2008).

Here, Mr. Minarcaja Concha seeks a writ of habeas corpus directing Respondents to immediately release him. (Pet. at 11.) He also seeks any "such other relief as the Court deems just and proper." (*Id*.)

In *Rodriguez-Acurio*, this Court provides the legal basis for ordering release from ICE detention as well as injunctive relief enjoining Respondents from invoking Section 1225(b) as the basis for subjecting a non-citizen habeas petitioner to mandatory detention, absent a change in relevant circumstances. *See Rodriguez-Acurio*, 2025 WL 3314420, at *31–32. Those same reasons support the grant of similar injunctive relief in addition to release in this action. A bond

determination by a DHS officer or an immigration judge would not remedy the core

constitutional violation at issue here. Mr. Minarcaja Concha's detention was unlawful from

its inception because ICE detained him under the wrong statute and without any notice or

opportunity to be heard, much less the procedures required under Section 1226(a). Accordingly,

"dispos[ing] of the matter as law and justice require," 28 U.S.C. § 2243, necessitates relief

guarding against re-detention in violation of this Court's determination that Mr. Minarcaja

Concha is not subject to mandatory detention under Section 1225(b). *Martinez v. McAleenan*,

385 F. Supp. 3d 349, 373 (S.D.N.Y. 2019) ("As Petitioner's arrest and detention were blatantly

unlawful from the start, the only commensurate and appropriate equitable remedy to even

partially restore Plaintiff is to immediately release him and enjoin the Government from further

similar transgressions" against him.)

## CONCLUSION

For the reasons explained above and in *Rodriguez-Acurio*, the Petition is granted in its

entirety. As noted, this Court ordered Respondents: (1) to return Mr. Minarcaja Concha from the

Cibola County Correctional Center to Nassau County or Suffolk County, New York no later than

December 13, 2025; (2) to release Mr. Minarcaja Concha from ICE custody once he is in Nassau

County or Suffolk County; and (3) to inform Petitioner's counsel of the precise time and location

of Mr. Minarcaja Concha's projected release so that family may pick him up. Additionally,

pending the issuance of any final removal order against Mr. Minarcaja Concha, Respondents are

enjoined from denying him bond in any subsequent proceeding on the basis that he must be

detained pursuant to 8 U.S.C. § 1225(b), absent a change in relevant circumstances consistent

with this Opinion and Order.


Dated:  Central Islip, New York
        January 28, 2026


                                          */s/ Nusrat J. Choudhury*
                                          NUSRAT J. CHOUDHURY
                                          United States District Judge